E-FILED
Wednesday, 04 June, 2025  10:33:25 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

---

**Marian Azab, Julia Gonzalez Calderon, Thomas Carty, Mark Johlke, Carmen Keist, Samantha Kirk, David Olds, Tyler Smith, Mathew Timm, and Daniel Yee,** individually and on behalf of all others similarly situated; and **the American Association of University Professors, Bradley University Chapter**;

          Plaintiffs,

   v.

**Bradley University,**

          Defendant.

---

### CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Marian Azab ("Prof. Azab"), Julia Gonzalez Calderon ("Prof. Calderon"), Thomas Carty ("Prof. Carty"), Oscar Gillespie ("Prof. Gillespie"), Mark Johlke ("Prof. Johlke"), Carmen Keist ("Prof. Keist"), Samantha Kirk ("Prof. Kirk"), David Olds ("Prof. Olds"), Tyler Smith ("Prof. Smith"), and Daniel Yee ("Prof. Yee"), individually and on behalf of all others similarly situated; Mathew Timm ("Prof. Timm"), individually and on behalf of the decision-making faculty; and the American Association of University Professors, Bradley University Chapter ("AAUP-Bradley") (collectively, "Plaintiffs"); by and through undersigned counsel, bring claims of breach of contract and violation of the Civil Rights Act of 1866 against the against the defendant, Bradley University ("Defendant," "the University," or "Bradley"), and in support of such claims, state as follows:

### NATURE OF THE CASE

1.   In December of 2023, Bradley University announced the termination of the employment of dozens of its faculty members ("the faculty terminations"). Through this decision, Bradley broke a

number of promises it had made to its faculty through the policies incorporated into their employment contracts, including that a) faculty would be afforded primacy in faculty status and educational decisions, b) the University would ensure employment security in the form of tenure-line faculty positions, thereby furthering shared governance and academic freedom principles, and c) Bradley would only eliminate academic programs based on educational considerations.

2. Through the faculty terminations, the administration eliminated programs, terminated faculty appointments, and violated faculty rights of governance and due process while refusing to consider non-academic cuts recommended by the FMSE and failing to eliminate inefficiencies and excessive spending in the senior administration's bureaucracy.

3. Plaintiffs are a) individual faculty members and putative class representatives whose employment was terminated, b) an individual faculty member and putative class representative who was precluded from participating in the shared governance of the institution, and c) an association of faculty members whose ability to protect and further faculty academic freedom, due process rights, and shared governance is severely limited due to the faculty terminations.

4. Plaintiffs seek reinstatement (if desired) and compensation for lost wages for all terminated faculty members, a declaration that the Faculty Handbook precludes the Bradley administration from making unilateral changes to faculty status and academic programs, a declaration that the Bradley administration breached the Faculty Handbook through the faculty terminations, and injunctive relief in the form of a stay on the decision to eliminate academic programs until the faculty has been permitted to exercise its contractual role in decisions regarding academic programs.

## PARTIES

5. Plaintiffs Azab (Sociology), Calderon (Spanish), Kirk (Mathematics), Smith (Business Law) and Yee (Mathematics) are current and former faculty members of Bradley University who were notified in November and December of 2023 that their employment would be terminated. They

comprise part of a putative sub-class of tenure-track faculty members whose employment the University claims to have terminated for financial reasons.

6. Plaintiff Azab is of Arab descent and Egyptian national origin.

7. Plaintiffs Carty (Mathematics), Johlke (Marketing), Keist (Apparel Production and Merchandising), and Olds (Hospitality Management) are employed as a tenured faculty at Bradley University and were informed in December of 2023 that their employment would be terminated "on or after December 15, 2024." Profs. Carty, Johlke, Keist, and Olds earned and were granted tenure prior to the 2023-24 academic year. They bring this suit as a class action and seek to represent a putative sub-class of tenured faculty members whose employment the University is terminating for reasons not permitted by Bradley's Faculty Handbook.

8. Plaintiff Mathew Timm is a Professor of Mathematics at Bradley and representative of the putative class of faculty members to whom the Faculty Handbook assigns primary responsibility in educational and faculty employment status.

9. AAUP-Bradley is an organization of Bradley University faculty members and an advocacy chapter of the American Association of University Professors. AAUP-Bradley's purpose is the protection and promotion of faculty members' academic freedom, due process rights, and faculty governance. AAUP-Bradley has associational standing to represent its members in this action. Through this action, AAUP-Bradley seeks declaratory and injunctive relief.

10. At all times relevant hereto, the University was a private, not-for-profit organization properly recognized and sanctioned by the laws of the State of Illinois.

## JURISDICTION AND VENUE

11. This Court's jurisdiction is invoked pursuant to its authority over civil actions arising under the laws of the United States and pursuant to its authority over claims that form part of the same case or controversy as those arising under federal law. 28 U.S.C. §§ 1331, 1367.

12. Venue is proper under 28 U.S.C.§ 1391(b) because Defendant is located in the Central District of Illinois and the unlawful practices alleged herein took place in this district.

## FACTS COMMON TO ALL CLAIMS

### a.  *The contracts at issue*

13. Bradley faculty members are employed pursuant to appointment contracts, each of which incorporates by reference the Bradley University Faculty Handbook ("the Handbook").

14. The initial appointment contracts of Profs. Azab, Kirk, Smith, and Yee are attached hereto as Exhibits C-F. The Faculty Handbook that was in place at the time of Prof. Smith's tenure-track appointment is attached hereto as Exhibit M.

15. Tenure-track initial appointment letters specify the tenure application date (typically five years after the initial appointment), the tenure notification date, and the tenure effective date (typically six years after the initial appointment). Exs. C-F. They further state that faculty obligations, freedoms, and privileges provided through the contract are outlined specifically in the Faculty Handbook. Bradley designated the tenure application date as fall of 2028 for Profs. Azab, Calderon, and Kirk; fall of 2025 for Prof. Yee, and Fall of 2024 for Prof. Smith. On information and belief, all initial appointment letters for the terminated tenure-track faculty use substantively identical language.

16. For both tenure-track and tenured faculty members (referenced collectively as "tenure-line faculty"), the University issues an annual letter specifying their salaries for the year, establishing the dates of the academic year, and reiterating the incorporation of the Handbook into their contracts.

4

The annual letters for Profs. Carty, Keist, and Olds for the academic year 2023-24 are attached hereto as Exhibits G-I. On information and belief, all annual appointment letters for all tenure-line faculty use substantively identical language.

17. For tenured faculty, the first annual renewal letter following promotion and tenure specifies the effective date of the award of tenure and reiterates that the Handbook governs faculty obligations and privileges. *See e.g.* Exhibit J.

18. For tenure-line faculty, Bradley's issuance of the annual renewal letter does not imply that the University may renew or not renew the faculty members' contract annually for any reason. Rather, tenured faculty have a permanent appointment which must be renewed annually unless exigent circumstances specified in the Handbook are present, as explained further below.

19. Similarly, tenure-track faculty are hired with a specified probationary period (typically six years), which will only be shortened if the faculty fails to perform up to standards specified in the Handbook and established by the faculty as evaluated by the faculty. *See e.g.* Ex. C at p. 3; Ex. D at p. 3; Ex. F at p. 4 ("The length of your tenure-track probationary period subject to satisfactory performance, with three years of credit toward tenure (see attached MOU) will run from August 2023 through May 2026.").

20. Bradley may only opt to not renew tenure-track faculty members' annual appointments during the probationary period under defined circumstances and pursuant to specific procedures, such as poor work performance. Exhibit A, Faculty Handbook at pp. 74, 85-86; *see also* paragraph 23, *infra*.

21. The Handbook describes the term of the tenure-track appointment as follows:

> The probationary period provides a period during which a department reviews the performance of a faculty member in terms of its established criteria. When a faculty member is appointed to a tenure-track position, the department judges this individual to possess the potential to attain tenure and promotion. Each year through the annual review process, the department assesses the faulty [*sic.*] member's progress toward achieving this goal. The annual review provides a formal statement regarding the faculty member's professional performance. . . . The probationary period is six years.

Exhibit A, Faculty Handbook at pp. 85-86 (emphasis added).

22. Near the end of the probationary period, the University, acting primarily through the faculty, conducts a detailed review of the tenure-track faculty member's performance record and determines whether to award tenure. Exhibit A, Faculty Handbook at pp. 85-86; Exhibit B, 11-12-24 Faculty Handbook at pp. 86-87.

23. The Faculty Handbook provides five exclusive conditions under which the University may terminate the employment of tenured faculty and faculty with probationary appointments before the end of the specified term: (1) termination for cause, such as for incompetence; (2) financial exigency; (3) "bona fide" discontinuation of a program or department not mandated by financial exigency; (4) an inability to fulfill the terms or conditions of an appointment due to medical condition, or (5) non-renewal of tenure-track faculty members' annual appointments prior to the end of the probationary period due to inadequate performance. Exhibit A, Faculty Handbook at. pp. 74, 85-86, 100-103.

24. In contrast, some faculty contracts specify that the appointments are intended to be temporary and do not imply a continued appointment. On information and belief, these contracts contain language such as, "[Y]our position is . . . not a tenure track position and nothing in this agreement nor in the Faculty Handbook should be taken as implying any continuance of your appointment beyond the prescribed term."

### b. The Faculty Handbook

25. The Handbook is among the regulations of the Board of Trustees. Exhibit B, 11-12-24 Faculty Handbook at p. 1. The Handbook was last revised on September 30, 2022 and November 12, 2024. Faculty members are provided notice of and access to the Handbook prior to accepting their initial appointment letters and throughout their period of employment, and the Handbook was available to faculty on Bradley's website at all times relevant to this litigation. On information and belief, the Board

of Trustees approved each of these versions of the Handbook, which are attached hereto as Exhibits A and B.

26. "Bradley University operates on the principle of shared governance" through which "faculty members shall participate in the committee structure and governing process of the department, college, and University." Exhibit A, Faculty Handbook at p. 84; Exhibit B, 11-12-24 Faculty Handbook at p. 85.

27. The Handbook requires that faculty be afforded significant deference in making decisions that affect the academic integrity of the institution. It explains:

> The faculty, through the University Senate, has primary responsibility for such fundamental areas as curriculum, research, faculty status, and those aspects of student life which relate to the educational process. On these matters, the power of review or final decision lodged in the Board of Trustees, or delegated by it to the President, should be exercised adversely only in exceptional circumstances, and for reasons communicated to the faculty. Following such communication, it is desirable that the faculty should have an opportunity for further consideration and further transmittal to the President or the Board. . . . On questions of faculty status, as in other matters where the faculty has primary responsibility, the administration should concur with the faculty judgment except in rare instances and for compelling reasons which should be stated in detail. Moreover the right of appeal continues through the administrative levels, including the President.

Exhibit A, Faculty Handbook at pp. 7-8; *See also* Exhibit B, 11-12-24 Faculty Handbook at pp. 7-8.

28. Decisions regarding faculty status include decisions regarding "appointments, reappointments, decisions not to reappoint, . . . and dismissal." Exhibit A, Faculty Handbook at p. 7; Exhibit B, 11-12-24 Faculty Handbook at pp. 7-8.

29. For example, the Handbook states, "Recommendations for full-time appointment, reappointment, tenure and promotion shall originate with the department faculty," the chairperson "will add a recommendation to that of the faculty," and "the Dean of the College . . . will add a recommendation to the recommendatory package." Only then does the Provost make the final decision about renewal. Exhibit A, Faculty Handbook at p. 74; Exhibit B, 11-12-24 Faculty Handbook at p. 74.

30. The Faculty Handbook mandates that before issuing notices of termination to faculty pursuant to discontinuations, the University will make every effort to place the faculty in another suitable position. Ex. A at p. 103; Ex. B at pp. 103-04. If there is no suitable position, "the faculty member's appointment may be terminated, but only with severance salary equitably adjusted to the faculty member's length of past and potential service." *Id.*

31. The Handbook states, "The decision to discontinue a program, department, or division of instruction will be based solely on educational considerations, as determined primarily by the faculty as a whole or an appropriate committee thereof." Ex. A at p. 103 § 3(a); Ex. B at p. 103 § 3(a).

32. The Handbook also elaborates on the meaning of "educational considerations." It provides, "Such educational considerations shall not include cyclical or temporary variations in enrollment, but shall reflect long-range judgments that the educational mission of the University will be enhanced by the discontinuation." *Id.*

33. The Handbook creates a number of academic ranks, identified here in order of status, from lowest to highest: Lecturer, Instructor, Assistant Professor, Associate Professor, Professor, and Distinguished Professor. Ex. A at p. 37; Ex. B at p. 37. An Instructor may be considered for the position of Assistant Professor after completing a minimum of three full-time years at Bradley. Ex. A at p. 81; Ex. B at p. 81.

34. The purpose of the Lecturer position is to "augment, not substitute for, required Professorial, tenure-track positions." Exhibit A, Faculty Handbook, at pp. 87-88; Exhibit B, 11-12-24 Faculty Handbook at p. 87-88.

35. Prior to issuing a non-renewal decision, Bradley must provide the tenure-track faculty member "the opportunity to submit material which the faculty member believes will be helpful to an adequate consideration of the circumstances." Ex. A at pp. 37-8; Ex. B at pp. 37-8.

### c. *Bradley's financial dilemma and faculty terminations*

36. In late July 2023, University President Stephen Standifird announced that the University was facing a $13M fiscal budget shortfall and a large structural deficit. The Provost had just approved 42 tenure-track appointments during the 2022-23 academic year, including 15 new tenure-track lines.

37. President Standifird announced that to resolve this budget discrepancy, $10 million in permanent savings from Academic Affairs had to be identified by the end of the Fall 2023 semester.

38. Because of the possibility that these financial cuts would entail the discontinuation of programs, the Faculty Handbook required formation of a faculty review committee. The Handbook specifies, "The decision to discontinue a program, department, or division of instruction will be based solely on educational considerations, as determined primarily by the faculty as a whole or an appropriate committee thereof." Exhibit A, Faculty Handbook, at. p. 103; Exhibit B, 11-12-24 Faculty Handbook, at p. 103.

39. At the August 17, 2023 Special Meeting, the University Senate voted to create a committee called the Faculty Members of the Senate Executive Committee ("FMSE") and charged its six members with identifying recommended budget cuts. Prof. Timm served on the FMSE in 2023-24.

40. In September and October of 2023, President Standifird promised publicly that the University would follow the recommendations of the FMSE, provided it located $10 million in savings within Academic Affairs.

41. As they deliberated, the FMSE asked the administration for documentation of the stated financial shortfall and the data necessary for determination about cuts to Academic Affairs. The Administration provided financial data to FMSE, but it was highly flawed. Although FMSE emphasized how flawed the data was and pointed out numerous inaccuracies, no better data was ever made available.

42. After lengthy, thorough and painstaking deliberations which included examination of enrollment records and educational priorities as well as participation in many meetings and deliberations, the FMSE arrived at recommendations that would have resulted in approximately $4.6M in savings in instructional costs and an additional cost savings of $4.6M in other areas of Academic Affairs. They also made recommendations for additional cost savings in the form of reducing the Athletics tuition subsidy and cutting senior Administration personnel and costs, such as by reducing spending on external consultants.

43. The FMSE communicated these recommendations in detail to President Standifird on October 21, 2023.

44. The administration's consultation with the FMSE turned out to be merely *pro forma*. Prior to receiving the FMSE's recommendations, President Standifird and Provost Zakahi initiated a completely separate process for arriving at the decision of what cuts to make. Through that process, they met with the Council of Academic Deans as well as with individual deans and decided on cuts to the academic budget and faculty positions. When serving in their administrative roles, deans are not considered members of the faculty.

45. Neither Bradley's Office of Institutional Effectiveness nor the University's Strategic Planning Committee was substantially involved in developing the cost-cutting strategies employed.

46. On November 6, 2023, President Standifird announced the possible elimination of 17 programs, dismissal of 47 faculty members, and the elimination of 21 faculty positions "through attrition."

47. On information and belief, in November and December of 2023, the administration did then decide to discontinue 15 programs, informed approximately 38 faculty members ("the terminated faculty") that their employment would be terminated, and eliminated 23 faculty positions "through attrition." On information and belief, twenty-one of the terminated faculty are tenured or tenure-track.

48. Despite making the termination decisions, the administration maintained unnecessary positions, inefficiencies, and high salaries for upper-level administrators at the University. Whereas Bradley faculty and staff received a 2% raise in January 2023, after 2.5 years with no raises, the University's 990 "reportable compensation" forms indicate that Bradley administrators received disproportionately large increases in compensation in Fiscal Year 2023. For example, although enrollment was declining, the Vice President for Enrollment Management received a salary increase of 13.8%, the Vice President for Legal Affairs and General Counsel received a salary increase of 14.6%, the Vice President for Intercollegiate Athletics received a salary increase of 14.9%, and the Provost and Senior Vice President for Academic Affairs received a salary increase of 10.1%. On information and belief, upper-level administrator salaries remained unnecessarily and unreasonably high even while several of those same administrators were participating in the termination of faculty appointments because of a purported financial crisis.

49. Some of the faculty terminations have or are likely to affect the integrity and coherence of Bradley's academic programs. For example, Bradley's planned cuts to Mathematics are likely to hamper its ability to offer students in other STEM areas such as Computer Science, Engineering, and Chemistry, a robust education.

50. Other cuts were made to successful academic programs that were not suffering from lower enrollment than comparable programs, or programs that could have easily attracted increased enrollment had they been properly supported by the upper administration, including Bradley's Vice President for Enrollment Management.

51. Some of the terminated tenure-track faculty had recently moved across the country or had left or turned down other opportunities to accept the position at Bradley. On information and belief, the administration already knew at the time of those professors' hire that Bradley would be making massive financial cuts to Academic Affairs.

52. At the time of the termination decision, some of the terminated faculty were on the verge of undergoing review for tenure and/or promotion that they had been working toward for years. For example, Prof. Smith was to be reviewed for tenure during the 2024-25 academic year.

53. For many of the terminated faculty, given the state of the job market in their fields, finding jobs comparable to their positions at Bradley has proven difficult and is likely to continue to be difficult. For most fields, there are very few tenure-track positions available, and universities rarely seek to hire faculty with tenure.

54. For tenure-track faculty who were given only one semester's notice of their termination, it was nearly impossible to find a comparable position for the next academic year, since the standard application period for tenure-track positions had already passed.

### d.  Contract breaches

55. The faculty terminations resulted from several violations of the Handbook.

56. First, in making determinations about faculty terminations, President Standifird and Provost Zakahi failed to consult the faculty and failed to provide the deference required to the faculty. In fact, the FMSE was not even provided a complete list of all the terminated faculty, nor a complete list of which positions the administration allowed to expire "through attrition."

57. The administration and Board of Trustees also failed to provide "compelling reasons" for rejecting the recommendations of the FMSE and for bypassing the faculty altogether. They failed to engage with the FMSE's explanation that further cuts to Academic Affairs would seriously undermine the academic integrity of the institution's educational mission.

58. The University's rejection of the FMSE recommendations is especially less than compelling when viewed in conjunction with the cuts the University *refrained* from making, such as reversal of the exorbitant raises it provided to members of the upper administration the year prior. Surprisingly the administration continued to invest in its Office of Inclusive Excellence, even as it was terminating the

12

employment of underrepresented minority faculty such as Profs Azab, Prof. Calderon, and the only female faculty member of Professorial rank in the Department of Mathematics (Prof. Kirk).

59. Second, the administration terminated the employment of tenured faculty and faculty with probationary appointments before the end of their specified term even though none of the conditions for termination of such appointments (identified in paragraph 23, *supra*) existed. Exhibit A, Faculty Handbook at pp. 85-86; Exhibit B, 11-12-24 Faculty Handbook, at p. 85-86.

60. In justifying the faculty terminations, Bradley has not claimed financial exigency, nor has it claimed to be terminating the employment of faculty for cause, because of medical conditions, or due to inadequate performance. Rather, the only arguably applicable justification for the faculty terminations was "discontinuation of programs not mandated by financial exigency" as well as the termination or non-renewal of individual faculty appointments.

61. However, the University failed to follow the required procedures for terminations pursuant to program discontinuations, as follows:

    a. The administration did not base discontinuation decisions "based solely on educational considerations, as determined primarily by the faculty as a whole or an appropriate committee thereof."

    b. The discontinuation of certain academic programs was also not "bona fide." For example, Bradley has no plans to discontinue the Departments of Marketing, Mathematics, and Family and Consumer Sciences, nor to discontinue instruction in Sociology and Spanish, yet announced it was terminating the employment of tenure-line faculty members therein, including Profs. Azab, Calderon, Carty, Johlke, Keist, Kirk, Olds, and Yee.

    c. Prior to informing tenure-line faculty members of the termination of their positions through the faculty terminations, the University did not "make every effort" to place

13

the faculty members concerned in other suitable positions, nor offer them severance "equitably adjusted" to their length of service. In fact, on information and belief, the administration did not even inquire or explore whether most of the terminated faculty members' positions could be restructured so that they could continue to teach the courses the University planned to continue to offer. On information and belief, the University in fact continued to offer classes or plans to continue offering classes that the vast majority of the terminated faculty members could have taught or could teach after their termination dates.

62. Third, the University claims that regardless of whether it followed the discontinuance procedures, it was entitled not to renew the contracts of tenure-track faculty members pursuant to the University's routine non-renewal process. But the University also did not follow the Handbook procedures for non-renewal, for the following reasons:

a.  On information and belief, the nonrenewal decisions for tenure-track faculty were made unilaterally by the upper administration (and approved by the Board of Trustees); on information and belief, the faculty and department chairs were bypassed completely.

b.  Prior to making the decision not to renew the contracts of tenure-line faculty members, the administration did not provide the terminated tenure-track faculty members the opportunity to "submit material which the faculty member believes will be helpful to an adequate consideration of the circumstances."

c.  The nonrenewal decisions were not made based on the performance criteria specified in the contract, but rather were based on financial margins data and enrollment trends that were not only incomplete but highly flawed.

63. Finally, the University violated the Handbook by terminating the employment of faculty in Professorial rank positions and assigning non-tenured Lecturers, Instructors and faculty with Special Appointments to teach classes they could have taught.

### e.  Internal Grievances and Appeals

64. On February 19, 2024, the FMSE filed a grievance against President Standifird in accordance with the procedures in the Faculty Handbook, challenging the disregard for the findings of the FMSE reflected in the program discontinuations he announced on December 11, 2023. In its grievance, the FMSE argued that contrary to the Faculty Handbook, the decision to discontinue programs was neither made primarily by faculty nor on the basis of educational considerations.

65. On April 10, 2024, the AAUP filed a grievance against President Standifird and the Bradley Administration. The grievance was filed in accordance with the policies in the Faculty Handbook. Ex. A at p. 90-93. In its grievance, the AAUP argued that contrary to the Faculty Handbook, Bradley's decision to discontinue programs denied faculty the right and responsibility to determine curriculum and faculty status.

66. Some of the terminated tenure-line faculty members (including Profs. Azab, Calderon, Olds, Smith, and Yee) filed appeals of the announced termination of their appointments pursuant to the Handbook's due process procedures with the University Senate Tenure, Promotion, and Dismissal Committee, (the "TP&D").

67. On May 6, 2024, ruling on the FMSE grievance, the Grievance Committee found that the administration had violated the Faculty Handbook by giving "minimal to no consideration" to faculty recommendations and by failing to base discontinuation decisions on educational considerations. It also found that when the administration charged the FMSE with making cuts, it provided "significantly flawed data, such as erroneous enrollment numbers etc." Finally, the Grievance Committee found that "President Standifird did not make efforts to place faculty members adversely

affected by the program discontinuations in other suitable positions," as required by the Faculty Handbook. The Grievance Committee recommended that the discontinuation decisions be revoked and that faculty who were given notice of nonrenewal or termination be reinstated.

68. On May 13, 2024, ruling on the AAUP grievance, the Grievance Committee found that the administration improperly refused to participate in the grievance and provide information, hindering due process. It further found that the administration improperly prevented the faculty from exercising their right and primary responsibility to make determinations about the curriculum and faculty status, failed to follow the required procedure outlined by the Faculty Handbook for program discontinuation, and unjustly dismissed tenured and tenure-track faculty.

69. On May 31, 2024, the TP&D Committee determined that Profs. Azab, Calderon, Smith, and Yee had been dismissed prior to the end of their six-year terms for reasons unrelated to their performance as faculty, in violation of the Handbook. Exhibit K.

70. On April 10, 2025, the TP&D Committee determined that Prof. Olds' dismissal from Bradley represented a violation of his employment contract and that adequate cause for his dismissal had not been demonstrated by the University. The TP&D Committee recommended immediate reinstatement of Prof. Olds. Exhibit L.

### f.   The administration's rejection of the findings of the Faculty Grievance Committee and the TP&D Committee

71. On information and belief, the administration rejected or ignored the findings and recommendations of the decisions of the TP&D Committee and the Faculty Grievance Committee in all appeals and grievances of the terminated faculty.

72. On September 12, 2024, for example, Interim President Jonathan Michael informed the appellant tenure-track faculty members that he was refusing to implement the TP&D Committee's recommendations to reinstate them. Prof. Azab appealed that decision to the Board of Trustees. On April 25, 2025, the Board of Trustees affirmed the Interim President's decision.

16

73. On October 29, 2024, the Board of Trustees rejected the recommendations of the Faculty Grievance Committee regarding FMSE's grievance.

74. On May 27, 2025, President James Shadid informed Prof. Olds that he was rejecting the TP&D Committee's reinstatement recommendation.

75. At no point did the administration or Board of Trustees offer any "compelling reasons" for disregarding these faculty recommendations, in violation of the strong deference the administration is required to afford faculty in matters relating to faculty status. Instead, the administration and Board identified flimsy reasons, or in some cases no reasons at all.

76. For example, the Board of Trustees and President Shadid argued that the FMSE's having located approximately $9.2 million in cuts to Academic Affairs as opposed to $10 million in cuts justified discarding completely the FMSE recommendations and refraining from even consulting the faculty about financial decisions regarding personnel in the fall semester of 2023. Notably, the administration started the process of making its own unilateral decisions about cuts (and informed several tenure-track faculty members of their terminations) before even knowing what the FMSE's recommendations were.

77. This rationale fails to account for the administration's responsibility to ensure decisions about discontinuation of programs and faculty status be made primarily by the faculty.

78. Second, the administration made a number of general statements about the financial health and continued viability of the University that do not explain why it was necessary to bypass the faculty in making determinations involving personnel and academic programs, particularly in light of the Faculty Grievance Committee's finding that the administration based its decisions on "significantly flawed data."

79. Third, the administration argued that the termination of tenure-track faculty members were non-renewals, not terminations, and the faculty terminations therefore did not violate those

professors' contracts. Bradley's interpretation of the "term" of the tenure-track appointments is inconsistent with the agreements' plain language; tenure-track appointment contracts specify that the term of the appointment is the probationary period, provided the faculty member performs up to standards, and the administration did not claim any of the terminated faculty were deficient in performance. Further, the administration failed to explain why those non-renewals occurred in complete disregard for shared governance rules.

80. Finally, President Shadid claims that he is "not aware of other suitable positions for Dr. Olds." This does not explain why no effort was made *prior* to Prof. Olds' termination to identify such suitable positions, as required by the Handbook.

### g. Class Allegations

### Class 1: Terminated Faculty Members

81. Profs Azab, Calderon, Carty, Johlke, Keist, Kirk, Olds, Smith, and Yee bring this action pursuant to Rule 23 of the Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals defined as follows:

82. **Numerosity:** The exact number of Class members is unknown and is not available to Plaintiffs at this time, but on information and belief, Defendant terminated or has communicated its intention to terminate the employment of approximately 38 faculty members pursuant to the budget-related cuts to Academic Affairs in the fall of 2023 that are alleged herein. Individual joinder in this case is impracticable. Class members can be easily identified through Defendant's records or by other means. Other factors including geographic diversity of members of the class and the possibility of retaliation further render joinder impracticable.

83. **Commonality and Predominance:** There are several questions of law and fact common to the claims of Plaintiffs and the Class members, and those questions predominate over any questions

that may affect individual Class members. Common questions include, but are not limited to, the following:

    a. Whether the faculty were afforded appropriate deference in decisions relating to faculty status;

    b. Whether the Handbook's conditions for termination of faculty members were satisfied;

    c. Whether the discontinuation of academic programs was "bona fide."

    d. Whether the discontinuations of academic programs were based on educational considerations; and

    e. Whether the administration made "efforts to place faculty members adversely affected by the program discontinuations in other suitable positions."

84. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in class actions. Plaintiffs have no interest antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs.

85. Appropriateness: Class proceedings are also superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. Further, it would be virtually impossible for the individual members of the Class to obtain effective relief because the damages suffered by the individual Class members are likely outweighed by the burden and cost of individually conducting the complex litigation necessitated by Defendant's actions. Even if Class members were willing or able to pursue such individual litigation a class action would still be preferable due to the fact that a multiplicity of individual actions would likely increase the expense and time of litigation given the complex legal and factual controversies presented in this Class Action Complaint and risk inconsistent results. A class action on the other hand, provides the benefits of fewer management difficulties, single adjudication, economy of scale, and comprehensive supervision by a

single Court, and would result in reduced time, effort, and expense for all parties and the Court, and ultimately, the uniformity of decisions.

<strong>Class 2: Decision-Making Faculty Members</strong>

86. Prof. Timm brings this action pursuant to Rule 23 of the Rules of Civil Procedure on behalf of himself and a class of similarly situated individuals defined as follows:

87. **Numerosity:**  The exact number of Class members is unknown and is not available to Plaintiffs at this time. However, it is comprised of the faculty as a whole (Bradley University currently has approximately 300 full-time faculty members. The faculty are charged with making decisions about faculty status and discontinuation of academic programs. The decision-making faculty include the 2023-24 FMSE, to which the Senate delegated the authority to make recommendations about cuts to Academic Affairs, as well as department chairs and program directors. Other factors including geographic diversity of members of the class and the possibility of retaliation further render joinder impracticable. Individual joinder in this case is thus impracticable. Class members can be easily identified through Defendant's records or by other means.

88. **Commonality and Predominance:** There are several questions of law and fact common to the claims of Plaintiffs and the Class members, and those questions predominate over any questions that may affect individual Class members. Common questions include, but are not limited to, the following:

    a.   Whether the discontinuations of academic programs were made based on educational considerations;

    b.   Whether the faculty were afforded appropriate deference in decisions relating to faculty status and curriculum; and

    c.   Whether the administration provided the decision-making faculty members the information they needed to make informed recommendations.

89. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in class actions. Plaintiffs have no interest agnostic to those of the Class, and Defendant has no defenses unique to Plaintiffs.

90. Appropriateness: Class proceedings are also superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. Further, it would be virtually impossible for the individual members of the Class to obtain effective relief because the damages suffered by the individual Class members are likely to be outweighed by the burden and cost of individually conducting the complex litigation necessitated by Defendant's actions. Even if Class members were willing or able to pursue such individual litigation a class action would still be preferable due to the fact that a multiplicity of individual actions would likely increase the expense and time of litigation given the complex legal and factual controversies presented in this Class Action Complaint and risk inconsistent results. A class action on the other hand, provides the benefits of fewer management difficulties, single adjudication, economy of scale, and comprehensive supervision by a single Court, and would result in reduced time, effort, and expense for all parties and the Court, and ultimately, the uniformity of decisions.

## LEGAL CLAIMS

### Count I
### Breach of Contract

91. Each paragraph of this complaint is incorporated as if fully restated herein.

92. The Handbook's provisions on the termination of faculty, faculty status, contract renewal and discontinuation of academic programs comprise part of Plaintiffs' employment contracts with the University.

93. The University breached its employment contracts with Plaintiffs and all Class members when it decided to terminate or not renew the contracts of approximately 38 faculty members in violation of the policies and procedures outlined in the Handbook for the termination and nonrenewal of faculty appointments.

94. The University breached its contract with the terminated tenured faculty members and the terminated faculty members whose appointments were or will be terminated before the end of their specified term when it made the decision to terminate their appointments before making every effort to place the faculty members concerned in other suitable positions.

95. The administration caused a material breach of the University's contract with its faculty members when it determined, pursuant to the 2023 faculty terminations, that it had the power to make unilateral decisions about the status of faculty appointments, effectively eliminating tenure and the procedural protections of the Handbook.

96. The University violated its duty of good faith and fair dealing by going through the motions of consulting the faculty without actually taking their recommendations into consideration.

97. The University violated its duty of good faith and fair dealing by making cuts to Academic Affairs that were not necessary, as evidenced by, for example, exaggerating the extent of the budget deficit and insisting that the entire $10 million worth of cuts in the Fall of 2023 come from Academic Affairs.

98. Through their unilateral cuts to Academic Affairs, the administration has harmed Plaintiffs in a number of ways:

    a. Terminated faculty have lost salary, benefits, and harm to their careers;

    b. Faculty have lost the protection of tenure, resulting in fewer faculty members with long-term institutional knowledge, fewer due process rights, less job security, and consequently, weaker academic freedom protections;

    c. A larger number of faculty will have appointments that are intended to be temporary and/or that have relatively few due process protections;

    d. Faculty have lost their ability to fully participate in faculty governance, as contemplated by the parties in the Faculty Handbook, hampering Bradley's ability to offer autonomy and due process rights to prospective faculty;

    e. Faculty members have lost the ability to participate fully in the development of the curriculum and the maintenance of the integrity of academic programs and areas of study, thus hampering their ability to offer a robust and comprehensive educational program to their students; and

    f. Some tenured faculty members, having been served termination notices, have chosen to withdraw their previously-submitted materials for consideration of promotion to Full Professor, thus harming the planned progression and growth of their careers.

WHEREFORE all Plaintiffs respectfully request:

- A declaration that Defendant's decision to discontinue programs and terminate or non-renew faculty appointments violated faculty contracts and the Faculty Handbook as alleged herein, and that specifically Bradley breached faculty contracts and the Handbook by:

23

- o Failing to allow decisions about faculty status and discontinuation of academic programs to be made primarily by the faculty;

- o Terminating the employment of tenured faculty and faculty with probationary appointments before the end of their specified terms even though none of the conditions for termination of such appointments existed;

- o Terminating academic programs for non-educational reasons; and

- o Failing to "make every effort" to find suitable positions for faculty before deciding to terminate their appointments.

- A stay on the elimination of the academic programs until the faculty has been permitted to exercise its contractual role in decisions regarding academic programs, curriculum and faculty status; and

- A stay on implementation of the faculty terminations until the faculty has been permitted to exercise its contractual role in decisions regarding academic programs, curriculum and faculty status.

WHEREFORE, Plaintiffs Azab, Calderon, Carty, Johlke, Keist, Kirk, Olds, Smith, and Yee, individually and on behalf of all others similarly situated, respectfully request:

- Compensation for lost pay and benefits for terminated faculty;

- Reinstatement for each faculty member who has been given notice of non-renewal or termination in violation of their contracts (if desired by the faculty member); and

- Such other relief as law and justice allow.

**Count II**
**Race Discrimination (42 U.S.C. § 1981)**

99. Each paragraph of this complaint is incorporated as if fully restated herein.

100. Bradley hired Prof. Azab to a tenure-track position in the Department of Sociology, setting a probationary period of August 2023 through May 2029. Prof. Azab left a stable lecturer position she held at Nevada State University to take the position.

101. On November 6, 2023, Bradley gave Dr. Azab notice that her appointment would not be renewed beyond May 11, 2024, even while retaining a non-Arab and non-tenure-line sociologist and even while retaining a non-Arab tenure-track professor who started at the same time as Azab.

102. Following her termination, non-tenure-line faculty were assigned courses Prof. Azab could have taught. On May 30, 2024, Prof. Azab identified three courses being offered in the fall semester of 2024 that she could teach and asked if she could teach those courses as an Instructor, but was told they had already been offered to an adjunct/affiliate.

103. Defendant deprived Prof. Azab of equal rights in the making, modification and enjoyment of the benefits, privileges, terms and conditions of her contractual relationship with the University because of her race in violation of 42 U.S.C. § 1981.

104. Defendant's unlawful actions have caused Plaintiff lost wages and benefits, emotional distress, irreparable damage to her career, attorneys' fees, and other consequential damages.


WHEREFORE Plaintiff Azab respectfully requests:

- All wages and benefits she would have received but for the unlawful discrimination;

- Reinstatement;

- Emotional Distress damages;

- Other compensatory damages;

- Attorney's fees and costs; and

- Such other relief as law and justice allow.

### JURY DEMAND

Plaintiff requests a trial by jury with respect to any issues so triable.

Dated: June 4, 2025

Respectfully submitted,

*Marian Azab, Julia Gonzalez Calderon, Thomas Carty, Mark Johlke, Carmen Keist, Samantha Kirk, David Olds, Tyler Smith, Mathew Timm, and Daniel Yee* (individually and on behalf of all others similarly situated) and *The American Association of University Professors, Bradley University Chapter*

By:

/s/ Rima Kapitan
Rima Najjar Kapitan
KAPITAN GOMAA LAW, P.C.
Illinois Attorney No. 6286541
P.O. Box 46503
Chicago, IL 60646
Phone: (312) 566-9590
rima@kapitangomaa.com

M. Nieves Bolaños
HAWKS QUINDEL S.C.
Illinois Attorney No. 6299128
111 E. Wacker Drive
Suite 2300
Chicago, IL 60601
Phone: (312) 224-2423
mnbolanos@hq-law.com